## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DELORES PORTER,

Plaintiff,

v.

ANDREW SAUL, Commissioner of
Social Security,

Defendant.

Case No. 19-cv-3053

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

This case is before the Court on the parties' cross motions for summary judgement [35, 40]. Plaintiff Delores Porter alleges that she suffered from race, color, and age discrimination and a hostile work environment while employed at the Social Security Administration (SSA). She also alleges a Privacy Act claim related to the SSA's handling of her personal information. Both parties now seek summary judgement. For the reasons stated below, Porter's Motion for Summary Judgment [35] is denied and the government's motion [40] is granted.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are

material. *Id*. After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 250 (internal quotations omitted).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal citation and quotations omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (*citing Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id*. (citation omitted).

When cross-motions for summary judgment are filed, the Court construes all facts and draws all reasonable inferences in favor of the party against whom the motion was filed. *Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 361 (7th Cir. 2017). The Court treats the motions separately. *Marcatante v. City of Chi.*, 657 F.3d 433, 439 (7th Cir. 2011). *See also Kreg Therapeutics, Inc. v. VitalGo,*

2

*Inc.*, 919 F.3d 405, 416 (7th Cir. 2019) ("Each cross movant for summary judgment bears a respective burden to show no issue of material fact with respect to the claim.").

## BACKGROUND[1]

### I. Porter and the Benefits Authorizer Role

Delores Porter is an African American woman and military veteran with "chocolate caramel brown" skin who is over forty years old. DSOF ¶ 4; PSOF ¶ 33. On September 17, 2017, she was hired as a Benefits Authorizer (BA) for the SSA service center in Chicago on a one-year probationary basis. DSOF ¶ 3. For most of her employment, Porter was supervised by Assistant Training Module Manager Kristina Edwards. *Id.* at ¶ 6. A week before Porter's termination, Assistant Training Module Manager Sherri Washington became Porter's primary supervisor. *Id.* at ¶ 7. Edwards and Washington reported to Training Module Manager Lisa Evans. *Id.* at ¶ 8. Defendant Andrew Saul is the Commissioner of the Social Security Administration. *Id.* at ¶ 5.

A BA is a technically demanding role responsible for ensuring accurate records and calculating benefit amounts. *Id.* at ¶ 9. To acquire the necessary skills, new hires participate in seven months of daily classroom training. *Id.* at ¶ 10. The program has several elements, including classroom instruction, testing, and extended simulations

---

[1] The facts in this Background section are undisputed unless otherwise noted. The government's Rule 56.1 Statement of Facts (Dkt. 41) is abbreviated as "DSOF." Porter responded to the government's statement at Dkt. 49-1 and filed a Statement of Additional Facts (Dkt. 49-2) abbreviated as "PSOAF." Porter's Rule 56.1 Statement of Facts (Dkt. 37) is "PSOF". The government responded to Porter's Statement of Facts at Dkt. 48 and to the Statement of Additional Facts at Dkt. 54. The government asserts several violations of Local Rule 56.1 in Porter's statements of facts. Whether to require strict compliance with Local Rule 56.1 is in the Court's discretion. *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 414 (7th Cir. 2019). The Court addresses particular statements of fact or evidence in the opinion as is necessary.

3

called "case breaks." *Id.* at ¶ 15. In order to evaluate the trainees, they take eleven tests over the course of the training. *Id.* at ¶ 16. The course instructors also provide reviews of the trainees conduct in the classroom. *Id.* at ¶ 18. Case breaks, meanwhile, are multi-day breaks from the regular instruction where the trainees work on actual Social Security cases which are then reviewed and corrected by a mentor. *Id.* at ¶ 21.

Along with regular instruction, trainees may request extra tutoring. If a trainee scores below 80% on a test, tutoring is supposed to be offered to them. *Id.* at ¶ 33. Finally, the "Career Ladder Plan" for the BA role, signed by both Porter and Edwards in this case, states that new hires must successfully complete the basic training course and that hires receive on-the-job training in addition to the formal program. *Id.* at ¶¶ 2-3; Pl. Ex. T, Dkt. 37-7. Article 16 of the National Agreement states that the Agency is responsible for providing training when it is required by a career ladder plan. PSOAF ¶ 1.

To track their progress, trainees receive regular performance discussions, which are written memorandums and in-person discussions detailing their performance in the program. DSOF ¶ 25. Consistent with Article 21 of the SSA's National Agreement with the American Federation of Government Employees, trainees are only assessed on two elements: "engaging in learning" and "interpersonal skills." PSOAF ¶ 29.

At the beginning of their training, new hires are provided with a copy of the Individual Performance Assessment System (IPAS). DSOF ¶ 13. The document is intended to "provide trainees with a clear perspective on how well they are progressing toward meeting their full work potential." *Id.* at ¶ 14. Among the

expectations outlined in the IPAS is that trainees make steady progress in mastering the course material. *Id.* At the same time, it also states that "[t]he performance expectations *outlined . . .* will be *used only to* determine when an employee will be taken off review," a period of monitoring after successful completion of the training course. *Id.* at ¶ 7.

## II. Class Makeup and Performance

When Porter began the training, there were twelve trainees in her class, titled BA 17-03. *Id.* at ¶ 11. Edwards was responsible for this class and another occurring at the same time down the hall, titled BA 17-04. *Id.*

Porter's class had four African American women, including Porter. *Id.* at ¶ 49. None of these women completed the course. *Id.* One was terminated before the first exam for some form of misconduct. *Id.* at ¶ 50. Another resigned for what the government describes as personal reasons. *Id.* Porter and an African American woman under forty with the initials S.G. were terminated for poor class performance. *Id.* They were the only people in the class with a test average below 70%. *Id.* at ¶ 49. The next closest was an African American man with the initials E.J., who averaged 75.5% on the exams. *Id.*

In the other class that Edwards supervised, BA 17-04, there were five African American women, all under forty. *Id.* at ¶ 52. They all passed the course. *Id.* Only two people who started the class in this group did not complete it. *Id.* at ¶ 53. One was a white man who was terminated for misconduct, and another was an African

5

American man who was terminated for poor performance based on an average test score of 59.3% and negative instructor feedback. *Id.*

### III. Porter's Performance

Like the other students, Porter's progress was tracked through performance discussions, that summarized her instructor feedback, class breaks, and test performance. Although they consistently praise her interpersonal skills, each of her five performance discussion memorandums record significant concerns with the "engages with learning" element, specifically her ability to master the material. *Id.* at ¶¶ 28-32. Her first discussion, on November 9, 2017, stated that "[t]here have been concerns regarding your ability to grasp the BA material." *Id.* at ¶ 28. As the course progressed, the feedback became more pointed. The February 26, 2018 discussion, for example, told Porter that "[w]hile you follow along during classroom instruction, you struggle significantly with exercises. You are unsure where to begin, and you must be coached through them in every lesson. If you do complete exercises on your own, they result in incorrect answers." *Id.* at ¶ 31. Porter views these and similar comments made during performance discussion as belittling and indicative of age discrimination. PSOF ¶ 35.

This feedback is consistent with the experience of the classroom instructors. One, Andrew Makowski, said that Porter "was not satisfying the merit based expectations of the job" and was "consistently unable to complete exercises correctly." DSOF ¶ 19. Diana Rodriguez, another instructor, said that Porter needed extensive instructor

6

assistance, had poor organizational skills, and had "trouble completing exercises correctly or even knowing where to begin." *Id.* at ¶ 20.[2]

Porter also struggled in the case breaks. Porter participated in four case breaks during her period of employment. *Id.* at ¶ 22-24. In her first break, she completed three cases, two of which were incorrect. *Id.* at ¶ 22. In her second and third breaks she completed two cases each time, again with some errors. *Id.* at ¶ 23. During the last break, which lasted five days, she completed only one case and did so incorrectly. *Id.* at ¶ 24.

Porter was also evaluated through formal exams. She was tested on ten subjects during the course—she was fired before the final one. *Id.* at ¶ 17. The entire class retook the first test, on Rates, after over half of the class failed it the first time. *Id.* Excluding her first Rates test, SSA records Porter's exam scores as: 78%; 78%; 81%; 52%; 71%; 84%; 72%; 89%; 44%; and 45%. *Id.* As a result, her exam average at the time of her firing was 69.4%. When she was recommended for termination her final exam score of 45% had not been recorded, giving her an average at the time of 72.1%. PSOF ¶¶ 11, 57.

Porter says that these scores may be falsified, but her citations to the record provide no reason to think so. Dkt. 49-1 ¶ 17. In her April 6, 2018 performance evaluation, discussed in more detail below, her third to last exam, on Awards, was improperly entered as a 79% when it should have been an 89%. Pl. Add. Ex. E, Dkt.

---

[2] Porter suggests that the feedback of a third instructor would have been more positive. The Court, however, will not speculate about potential evidence not in the record.

52-1 ¶ 3. But the exam scores listed above includes the corrected score of 89%, and there is nothing in the record to suggest any of the other exam scores are inaccurate.

After scoring 78% on the second exam, on Payment Adjustment, Porter was offered tutoring. DSOF ¶ 34. She declined the offer. *Id*. Edwards offered Porter tutoring in Awards because she had missed the lesson and test due to illness. Def. Ex. 24, Dkt. 41-4 ¶ 3. Edwards provided Porter with two dates that she could receive tutoring on Awards. *Id*. Porter responded to Edward's email and said "OK, thanks Kristina," but did not accept the dates offered. *Id*. Porter asserts that she was not offered tutoring after either of her final two exams, including the exam on Awards. PSOF ¶ 26. The government disputes this, but neither party supports their assertions with relevant evidence. Dkt. 54 ¶ 26.

### IV. Porter's Personal Information

While Porter attended her training, another issue emerged. As an Army veteran, Porter was entitled to increased annual leave time due to her prior federal service. DSOF ¶ 36. In order to claim that time, paperwork had to be submitted by SSA to the Army, which then sent more information to the SSA's human resource department. *Id*. SSA never received paperwork from the Army, and so Edwards told Porter to contact the Army to investigate. *Id*. at ¶ 38. When Porter contacted the Army, she was told it had never received anything from the SSA. *Id*.

So, Porter resubmitted the required information to the SSA human resources department. *Id*. at ¶ 39. At Edwards's instruction, Porter copied her on the email. *Id*. The Army soon thereafter returned the necessary paperwork. *Id*. Attached to the

email was Porter's personal information, including her date of birth, her Social Security number, and her military history. *Id.* at ¶ 40.

Porter is now concerned with Edwards having access to this personal information. *Id.* She has not cited any evidence that Edwards personally misused her information. But at one point she received a voicemail stating that fraudulent activity had been linked to her Social Security number. *Id.* at ¶ 41.

### V. Porter's Firing

The SSA's termination policy is governed by Articles 23 and 33 of the National Agreement. PSOF ¶ 44. Article 23 requires that employees receive a thirty-day notice prior to termination. *Id.* Article 33, however, states that probationary employees should ordinarily be given two-week notice before firing, when practicable. PSOAF ¶ 28. It also states that probationary employees' performance may be observed and that they may be fired for cause. DSOF ¶ 44.

On April 6, 2018, Porter had what would be her final performance discussion. DSOF ¶ 32. Edwards prepared the report, but it was delivered by Washington, who had recently taken over as Porter's supervisor. PSOAF ¶¶ 10, 30. The report stated, in part:

> There have been concerns about your ability to successfully perform the BA job since your September report. However, these concerns have increased significantly over time. Your organizational skills are a detriment to your learning process. You are not organizing your notes and handouts in a manner that allows you to efficiently locate items needed for exercises and tests. You frequently ask questions about material that was just covered, and you are unable to do any BA work independently. This is a significant concern, especially this late in your classroom training. You are unable to complete any exercises correctly, even those that are basic and simple in nature. . . . Lastly, your SSI test score was drastically

low at 44%. This is not indicative of quality public service, nor does it indicate mastery of the lessons taught in class for the past five months.

DSOF ¶ 32. The report also stated that she was "unable to complete any MACADE coding," an important job function. *Id*. A prior performance discussion noted, however, that she had successfully completed MACADE coding actions. PSOF ¶ 12. The report also listed Porter's most recent test scores, except for her final one. PSOF ¶ 16. Her Awards test was listed as a 79% when she had scored an 89%. *Id*. In her meeting with Washington, Porter expressed her disagreement with the grading of her second-to-last exam, stating that several correct answers had been marked wrong, resulting in her score of 44%. PSOF ¶ 14.

That evening, Evans sent out a termination letter for Porter for final review. Pl. Add. Ex. L, Dkt. 52-4, 5. On April 10, Porter met with a union representative to tell them she believed she was about to be fired. PSOF ¶ 66. Later that day, Porter was escorted by Evans to an empty classroom guarded by SSA personnel. DSOF ¶ 46. Evans told her that she was being terminated, effective immediately, due to her poor performance in class. *Id*. She was then escorted by armed guards through the main entrance and off the premises. *Id*. Porter found this public shepherding humiliating. *Id*. According to Evans, it was standard SSA practice at the time. Dkt. 54 ¶ 11.

### VI. EEOC and the Present lawsuit

In July 2018, Porter filed a complaint with SSA's Equal Employee Opportunity office (EEO) alleging age and race discrimination and harassment related to her employment and firing. DSOF ¶ 55. After a formal investigation, the EEO issued a

10

Final Agency Decision finding no discrimination. *Id.* at ¶ 57. Porter timely filed the present lawsuit on May 6, 2019.

## ANALYSIS

Porter and the government have both moved for summary judgement. Porter's Motion does not contain any arguments; instead, it recites the legal standards of her claims. In her reply and response to the government's Motion, however, Porter articulates her view in response to the government's arguments. The parties address four major issues in their briefing: whether Porter has exhausted her color discrimination claim; whether summary judgement is warranted on the discrimination claims; whether summary judgement is warranted on the hostile work environment claims; and whether Porter has a valid Privacy Act claim.

### I. Color Discrimination

Along with her race and age discrimination claims, Porter alleges color discrimination in her complaint. "A Title VII plaintiff may bring only those claims that were included in her EEOC charge, or that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'" *Geldon v. S. Milwaukee Sch. Dist.*, 414 F.3d 817, 819 (7th Cir. 2005) (quoting *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 481 (7th Cir. 1996)). The government contends that Porter did not raise a color claim in her EEO charge and so is barred from doing so now. Meanwhile, Porter argues that her color discrimination claim is reasonably related to the race claim investigated by the EEO.

The Court need not determine whether Porter exhausted her color claim. Besides describing her skin tone, Porter does not make any arguments or offer any evidence unique to a color discrimination claim. Since none of Porter's discrimination claims survive summary judgement, this question is moot.

## II. The Discrimination Claims Are Dismissed

To find discrimination, a reasonable factfinder must be able "to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). In its evaluation, the Court asks "whether the totality of the evidence shows discrimination, eschewing any framework or formula." *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021). In order to "clarify and simplify" this analysis, the plaintiff may employ the *McDonnel Douglas* burden-shifting framework. *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). While this approach provides a clear test for surviving summary judgement, it "is just one way that a plaintiff can navigate her way to a jury in a discrimination case." *Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020). A fact-pattern that does not meet the *McDonnell Douglas* requirements may still demonstrate discrimination.

In its Motion for Summary Judgement, the government relies on an outmoded legal framework that distinguishes between "direct" and "indirect," i.e. *McDonnell Douglas*, approaches to proving discrimination. *See Ortiz*, 834 F.3d at 765 ("[D]istrict

12

courts must stop separating "direct" from "indirect" evidence and proceeding as if they were subject to different legal standards.") Porter's pro se filings, meanwhile, engages in *McDonnell Douglas* analysis but also the more holistic approach described by *Ortiz*. The Court will first evaluate whether the evidence of discrimination satisfies the *McDonnell Douglas* framework and then consider it holistically.

### A. Porter Cannot Satisfy the *McDonnel Douglas* Standard

Under the *McDonnell Douglas* framework, Porter must first establish that (1) she is a member of a protected class; (2) her performance met his employer's legitimate expectations; (3) despite this performance, she was subjected to an adverse employment action; and (4) her employer treated similarly situated employees outside of the protected class more favorably. *See Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 719 (7th Cir. 2018). If Porter can establish these four elements, the burden shifts to his employer to "articulate a legitimate, non-discriminatory reason for the adverse employment action." *South v. Ill. Envtl. Prot. Agency*, 495 F.3d 747, 751 (7th Cir. 2007). At that point Porter may rebut the Defendants' purportedly legitimate purpose with evidence of pretext. *See Eaton v. Indiana Dep't of Corr.*, 657 F.3d 551, 554 (7th Cir. 2011).

The parties do not contest that Porter, as a black woman over forty, is a member of several protected classes. It is also agreed that her firing was an adverse employment action. The government contends, however, that Porter has failed to identify a similarly situated employee or establish that she met the SSA's

performance expectations. The government also argues that SSA had a legitimate, non-pretextual reason for firing Porter.

In order to succeed under *McDonell Douglas*, the plaintiff must identify similarly situated employees outside of the protected class who were treated better. An employee is similarly situated when "he is directly comparable in all material aspects, including performance, qualifications, and conduct." *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 685 (7th Cir. 2014) (citing *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000), overruled on other grounds by *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). Failure to identify such employees is fatal to a *McDonell Douglas* claim. *See Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 853 (7th Cir. 2015). Porter argues that the non-African-American, male, and young classmates who were permitted to finish the class are similarly situated to her. She also emphasizes that the only people who did not finish the class were African-American women.

But the *McDonell Douglas* framework does not depend on whether other members of one's protected class suffered the same adverse action. Instead, Porter must show that non-protected, similarly-situated employees were treated better than she was. Despite Porter's assertions to the contrary, the classmates that completed the course were not similarly situated to her. She and the other employee dismissed for poor performance were the only employees to have average scores below 70%. DSOF ¶ 49. The next closest average was 75.5%, and the other averages were comfortably in the mid-80s to high 90s. *Id*. Test performance during an intensive training class is clearly

14

a "material" metric for comparison. Because Porter has failed to identify a comparable employee, she cannot satisfy the *McDonell Douglas* burden.

The government also argues that Porter failed to meet the SSA's performance expectations and that the SSA's had a legitimate reason for firing Porter. The reasoning is basically the same for the two elements—the SSA fired Porter not because of her race, gender, color, or age, but because of her incapacity to do the job at the level required. DSOF ¶¶ 17-24. This incapacity is demonstrated by the uncontroverted evidence of her poor performance in tests, case breaks, and instructor feedback throughout her training. *See Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021) (granting summary judgement when the "brunt of the evidence at summary judgment—his performance reviews by [the supervisor]— shows that [the plaintiff's] performance was at best, lackluster, and at worst, unacceptable.")

Porter offers two counterarguments: that her test scores were falsified; and that she was evaluated under a wrong or different standard. The evidence for the first claim relies primarily on the fact that, on her April 6 performance discussion memorandum, her Awards exam scores was incorrectly recorded as a 79% when she really earned an 89%. PSOF ¶ 16.[3] At times in her filings, Porter suggests that this is reason to believe that her other exam scores may have been tampered with. She also argues that the error is evidence that her test scores were used by the SSA as a pretext. But Porter has not offered any evidence that her test scores were

---

[3] Porter also asserts that the 45% recorded on her last exam was "erroneous," but she does so without evidentiary support.

manipulated, and an error on a single document does not reasonably allow for such an inference. Furthermore, there is no logical connection between the error and an argument that the firing was pretextual. Including her proper Awards grade in the calculations, she had an average of 69.4% when she was fired. Porter cites to no evidence suggesting that the SSA used the wrong test scores when deciding whether to fire her, or that the error was an intentional attempt to discredit her record. While the error was unfortunate (prior to being corrected), it does not render the uncontroverted evidence of Porter's underperformance pretextual.

Porter also argues that she was evaluated under a different standard from the other trainees. She cites to Article 21 of the National Agreement to support the view that new hires were not supposed to be appraised in their first year, saying she was improperly subjected to evaluation. Pl. Ex. W, Dkt. 37-7, Art. 21 § 9(C)(1). But while probationary employees are not to be appraised, the Article suggests that "appraisal" is a technical term and that new hires instead should be evaluated under a "pass/fail" plan. *Id*. at § 9(A)(1). Article 33, meanwhile, provides for ongoing consultations with new hires about their performance and progress as well as for their possible firing. Pl. Ex. V, Dkt. 37-7, Art. 33 § 3(B)-(C).

Continuing her standards-based arguments, Porter says that she was improperly held to standards outlined in the IPAS, while other classmates were evaluated according to the standards described in a document called the PACS Performance Plan. The filings are unclear as to the significance of these various performance metrics. However, the distinction Porter draws appears to be one without a difference.

16

The IPAS states that trainees are expected to "show steady progress in mastering the course content as well as an increasing ability to accurately and independently process casework. During the classroom phase of training, the trainee must be actively involved in the class and keep up with the rest of the class in all assignments including casework." Pl. Ex. H, Dkt. 37-4, at 6. The PACS plan, meanwhile, states that Porter was expected to, among other things, "[p]articipate[] in training by asking appropriate questions, researching information and successfully completing tests and assignments" and "[d]emonstrate[] progress towards independent completion of work." Pl. Ex. 2, Dkt. 37-8, at 1. These standards are consistent, not contradictory, and the evidence shows that Porter failed to meet either. Even if IPAS was incorrectly referenced in Porter's termination letter, that is not enough to prove the reasons given were pretextual or that Porter met expectations.

### B. A Holistic Review Does Not Show Discrimination

Porter has failed to meet the burden of the *McDonnell Douglas* approach. Her claim could still survive summary judgement, however, if the "evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). To make that determination, the Seventh Circuit has "identified three broad types of circumstantial evidence that will support an inference of intentional discrimination: ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for

17

disparate treatment." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 929 (7th Cir. 2020). But, as discussed in the previous section, Porter has failed to identify similarly situated employees or show that SSA's justifications are pretextual.

Beyond the issues already described, Porter raises a few potentially "suggestive" actions the Court will consider. First is the fact that all four African-American women, and only those women, in Porter's class failed to complete the course. DSOF ¶ 50. While this fact does not identify a similarly situated comparator, taken on its own it may raise suspicion that discrimination took place. This concern is significantly mitigated, however, by the fact that the other class that Edwards supervised concurrently had five African-American women in it, all of whom passed. *Id.* at ¶ 52. In that class, two men, one white and one African-American, failed to complete the class. *Id.* at ¶ 53. Without more, a reasonable jury could not find discrimination based on these outcomes.

Next, Porter states that the National Agreement guaranteed her thirty days' notice before she was terminated. *See* Pl. Ex. U, Dkt. 37-7, Art. 23 § 7(A)(1). Article 33, however, clarifies that probationary employees should be given two weeks' notice "when practicable." Pl. Ex. V, Dkt. 37-7, Art. 33 § 3(E). Failing to provide notice thus did not violate the National Agreement. Porter also argues that she was entitled to on-the-job training called for by her career ladder plan. But on-the-job training was to take place after completion of the class, and Article 33 provides for the termination of employees throughout their probationary period. *Id.* When evaluated, these potentially "ambiguous" elements do not give rise to a question of fact for a jury.

Finally, Porter suggests that she was discriminated against under a "cat's paw" theory of liability, where a subordinate influenced the final decisionmaker to fire her. A cat's paw theory, however, requires that the plaintiff show that the subordinate, in this case Edwards, "actually harbored discriminatory animus." *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 370 (7th Cir. 2019) (quoting *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 570 (7th Cir. 2017)). Beyond conclusory assertions, Porter has not done so. Summary judgement dismissing Porter's discrimination claims is warranted.

### III. Porter's Hostile Work Environment Claim Does Not Survive Summary Judgement

Porter's next claim is that she was subjected to a hostile work environment while employed by SSA. "Title VII . . . forbids employers from requiring people to work in a discriminatorily hostile or abusive environment." *Boss v. Castro*, 816 F.3d 910, 919–20 (7th Cir. 2016). A violation occurs when "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014) (quoting *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005)). To survive summary judgement, a plaintiff must provide sufficient evidence demonstrating that "(1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Boss*, 816 F.3d at 920.

In this case, Porter has failed to raise a question as to whether she was subject to severe or pervasive harassment based on her membership in a protected class. As examples of her harassment, Porter points to falsified grades, false and demeaning statements, denial of training, and public humiliation arising from the manner of her firing. The record, however, does not support this view. While one of Porter's exams was incorrectly recorded on her April 6 performance discussion memorandum, Porter does not cite any evidence that any of her other exam grades were ever misstated or that the incorrect recording had any substantive impact on her employment.

Similarly, she insists that Edwards and her instructors provided false and demeaning statements about her in her performance reviews. But while the feedback is pointed, and doubtless contestable based on one's perspective, it is not particularly cruel or demeaning—the comments focus on her performance in class, are consistent with each other and over time, and identify substantive steps she could take to improve. Reasonable steps taken by an employer to address an employee's failure to meet expectations do not constitute harassment. *Boss*, 816 F.3d at 920. The uncontroverted record also suggests that the manner of Porter's firing was standard SSA policy, not targeted harassment. *See also Hunter v. D.C.*, 797 F. Supp. 2d 86, 93 (D.D.C. 2011) (holding that ridiculing a terminated employee as he is escorted from the building by police officers does not constitute severe or pervasive harassment). A reasonable jury could not look at the evidence and conclude that Porter was subjected to "severe or pervasive" harassment.

What is more, there is no evidence that any harassment that Porter did suffer was because of her membership in a protected class. In *Bond*, the Seventh Circuit approved of summary judgement against the plaintiff's hostile work environment claim when the "record contain[ed] not a single racially offensive remark, email, or other hint of racial animus." 816 F.3d at 920. Porter's evidence is similarly lacking. Even if Porter was ill-treated, there is no evidence that her treatment was "based" on her membership in a protected class. And, as discussed in the previous section, the overall context does not suggest that the SSA officials acted with discriminatory intent. The evidence does not support the view that Porter was subjected to severe or pervasive harassment because of her membership in a protected class, and so her hostile work environment claim does not survive summary judgement.

### IV. Porter's Claims Related to Her Personal Information Are Dismissed

Finally, in her Response to the Defendant's Statement of Facts, Porter states that Edwards having her personal information violates the Privacy Act and demands identity theft protection and damages for the resulting emotional distress. *See* 5 U.S.C. § 552a (2018). The Privacy Act generally prohibits agencies from improperly disclosing records related to individuals. *Id.* § 552a(b). In order to recover on such a claim, the plaintiff must show that the violation was "intentional or willful." *Id.* § 552a(g)(4). The Seventh Circuit has held that a violation can only be shown by "evidence of reckless behavior and/or knowing violations of the Act." *Moskiewicz v. U.S. Dep't of Agric.*, 791 F.2d 561, 564 (7th Cir. 1986). So long as the "employees who

were involved reasonably believed that they were allowed access" the information, the plaintiff cannot recover. *Coburn v. Potter*, 329 F. App'x 644, 646 (7th Cir. 2009).

In this case, Edwards requested that she be copied on an email to SSA HR that contained Porter's date of birth, Social Security number, and military record. DSOF ¶ 39. This information was then sent to the Army and used to calculate Porter's service computation date. It is unclear whether Porter's disclosure of her personal information to Edwards is covered by the Privacy Act. But even if it is, Porter does not cite any evidence suggesting that Edwards was accessing information she knew she was not allowed to receive. Instead, the facts as described most reasonably suggest that Edwards was trying to make sure that the information was sent and followed up on after several delays so the Porter could receive service credits. Porter voluntarily included Edwards on the email chain. The record provides no evidence that would allow a reasonable jury to find a Privacy Act violation. The claim is dismissed.

## CONCLUSION

For the stated reasons, the plaintiff's Motion for Summary Judgment [35] is denied. The defendant's Motion for Summary Judgement [40] is granted. The Clerk is directed to enter judgment in the defendant's favor and against the plaintiff and terminate the case. The Clerk of the Court shall mail a copy of this opinion to the plaintiff.

E N T E R :

Dated: April 27, 2021

_____

MARY M. ROWLAND
United States District Judge